# United States Court of Appeals
## For the First Circuit

No. 06-2079

UNITED STATES OF AMERICA,

Appellee,

v.

HAMMAN MOUSLI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Howard, Circuit Judges.

Derege B. Demissie, with whom Demissie & Church was on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

December 13, 2007

**TORRUELLA, Circuit Judge.** Defendant-Appellant Hamman Mousli was arrested for fraudulent use of Universal Product Code ("UPC") stickers by Somerville police on June 9, 2004. The police applied for, and were issued, a search warrant for "19 Orvis Road," where the appellant lived. During the search, the police seized what appeared to be counterfeit U.S. currency as well as a rifle and a handgun. Prior to trial, Mousli filed a motion to suppress evidence seized from his apartment. At the conclusion of the Government's case, Mousli moved for a judgment of acquittal on the counterfeiting charge claiming that the evidence introduced was insufficient to establish that the bills were counterfeit or that he intended to defraud. The district court denied the motion and dismissed his claim. Mousli appeals these decisions. After careful review, we affirm the district court.

## I. Background

On April 1, 2004, security personnel at a Target store in Watertown, Massachusetts observed the defendant, Hamman Mousli, acting nervous and rapidly selecting electronic products in the store. They also observed him at the checkout where he paid $46.15 for products actually valued at over $200.00. Target security personnel allowed Mousli to leave, but they noted the car he was driving: a Chevy Blazer with New Hampshire license plate number 179 8326 ("the Chevy Blazer"). After an investigation by a Target investigator, Matthew Townsend, Target found that Mousli was using

pre-printed UPC stickers to purchase items below their true selling price. Townsend linked Mousli to similar scams at Target stores in Somerville, Everett, and Saugus, Massachusetts. Less than a week later, Mousli was confronted at the Target in Somerville by store personnel who called the Somerville police. At the time, Mousli was in possession of two pre-printed UPC stickers, and he was arrested.

That same day, Townsend saw the Chevy Blazer parked in the Target parking lot. Through the window of the car, Townsend saw a package that listed "19 Orvis Rd., Revere, MA" as the return address. When he was arrested, Mousli gave 19 Orvis Road as his address, which matched information the police had for him from the Registry of Motor Vehicles. The address also matched information Mousli provided at a prior arrest.

On June 3, 2004, Somerville Police Detective Sergeant Joseph McCain and another officer drove to 19 Orvis Road, and he viewed the house from the street. The house was a two-story, ranch-style house with a main entrance at the front and another entrance on the side. McCain also observed the Chevy Blazer parked nearby. Based on his observations of the house and the surrounding houses, McCain believed the house to be a single-family residence.

Subsequently, the police sought a search warrant for 19 Orvis Road in Somerville District Court. The application for the

search warrant was supported by affidavits from both McCain and Townsend.  The application stated that it was for a property "occupied by and/or in the possession of: Mr. Hamman Mousli."  The application also stated that the police sought to seize various types of documents potentially related to the UPC fraud, as well as computer equipment and illegally obtained merchandise.  The application described the property as:

> A residence located at 19 Orvis Road.  19 Orvis Road is a two story duplex residence brown and white in color . . . .  There are two entrances to the residence.  The main entrance is in the center of the first floor and is facing the street.  The number 19 is located to the left side of this door.  What appears to be a secondary entrance is located to the right side of the residence . . . .  To the right of 19 Orvis Road is another single family dwelling with the number 11 to the left side of the door.  The house is a white two story home.

On June 9, 2004, the court issued a warrant that described the property as a single-family, two-story duplex house. McCain and other officers executed the warrant that same day.  When they went to the front door of the residence, they were informed by the owners that Mousli lived in a basement apartment that had a separate entrance at the house's rear.  The police showed the owners the warrant and the owners permitted them to enter Mousli's apartment.  While searching the apartment, the officers found and seized ten bills of counterfeit U.S. currency in various

denominations. The bills were misshapen, discolored, splotched, and poorly cut. The officers also seized a rifle and a handgun.

On February 22, 2005, a federal grand jury returned a superseding indictment charging Mousli with violating 18 U.S.C. § 472,[1] possessing counterfeit securities, and 18 U.S.C. § 922(g)(5)(a),[2] being an illegal alien in possession of a firearm. On June 15, 2005, Mousli moved to suppress the evidence. After a hearing on April 26, 2006, the district court denied the motion. The case was then tried before a jury on June 12 and 13, 2006. On June 13, the jury returned guilty verdicts on both counts. On the same day, the district court imposed a prison sentence of time served to be followed by two years of supervised release. Mousli appeals.

---

[1] Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 472 (2000 & Supp. 2006).

[2] It shall be unlawful for any person . . . who, being an alien is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(5)(A) (2000).

## II. Discussion

### A. The Suppression Motion

On appeal, Mousli challenges the district court's denial of his motion to suppress the evidence the police found in his apartment at 19 Orvis Road, contending that the search violated the Fourth Amendment. His argument is without merit.

#### 1. Standard of Review

In reviewing the district court's denial of a motion to suppress, "we accept the trial court's findings of fact unless they are clearly erroneous and subject its conclusions of law to de novo review." United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). "A clear error exists only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. Ferreras, 192 F.3d 5, 9-10 (1st Cir. 1999). This court "will uphold a district court's decision to deny a suppression motion provided that any reasonable view of the evidence supports the decision." Id. at 10.

#### 2. The Particularity of the Warrant

The protections of the Fourth Amendment are meant to guard against an invasion of individual liberty by the government. The Warrant Clause of the Fourth Amendment prohibits the issuance of any warrant except one "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const.

amend. IV. "Any search intruding upon [an individual's] privacy interest must be justified by probable cause and must satisfy the particularity requirement, which limits the scope and intensity of the search." United States v. Bonner, 808 F.2d 864, 867 (1st Cir. 1986) (citing United States v. Heldt, 688 F.2d 1238, 1256 (D.C. Cir. 1981)). "When investigators fail to limit themselves to the particulars in the warrant, both the particularity requirement and the probable cause requirement are drained of all significance as restraining mechanisms, and the warrant limitation becomes a practical nullity." Ferreras, 192 F.3d at 10. Mousli argues that the particularity requirement necessitated that the warrant clearly authorize a search of his basement apartment.

"[T]he test for determining the adequacy of the description of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." United States v. Vega-Figueroa, 234 F.3d 744, 756 (1st Cir. 2000) (quoting Bonner, 808 F.2d at 866). While the particularity requirement obligates the police to "specify the precise unit that is the subject of the search," and "the general rule is that a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid," there are exceptions to this rule. United States v. Pérez, 484 F.3d 735, 741 (5th Cir. 2007).

The police can validly search a multi-unit dwelling even if the search warrant was only for a single-unit dwelling, provided the police reasonably believed that the dwelling contained only one unit. See Maryland v. Garrison, 480 U.S. 79, 85 (1987); see also Pérez, 484 F.3d at 741 (upholding validity of warrant where address listed in warrant had more than one occupancy unit). In Garrison, the Supreme Court said that "we must judge the constitutionality of [the police officers'] conduct in light of the information available to them at the time they acted." Garrison, 480 U.S. at 85.

Mousli argues that the search warrant obtained by the Somerville police lacked sufficient specificity because it did not identify his particular basement unit, but only listed 19 Orvis Road. Mousli relies on Ferreras in arguing that the authority granted by any warrant is limited to the specific places described in it, and thus, does not extend to additional or different places. See Ferreras, 192 F.3d at 11. Mousli's reliance is misplaced.

In Ferreras, we found that an attic was, in effect, included in a search warrant for the second floor of that same building because it was connected to the second floor apartment, lacked an exit to the street, and was not equipped for "independent living." Id. Mousli concludes from Ferreras's holding that because his basement apartment existed independently from the rest of the house, had an exit to the street, and was equipped for

-8-

"independent living," it could not have been included in the warrant that sought to search only "19 Orvis Road." We disagree with Mousli and find the facts in Ferreras distinguishable here.

In the present case, the police used all of the information reasonably available to them to secure as particularized a warrant as possible. The police made considerable efforts to gather as much information as possible to include in their affidavits and application for the warrant. The police drove by Mousli's residence before securing the warrant. They did not know that 19 Orvis Road was a multi-unit dwelling. Townsend noted Mousli's address on a package in his car as 19 Orvis Road, and police records indicated that Mousli's address was 19 Orvis Road. Mousli had given 19 Orvis Road as his home address when he was arrested on a previous occasion. The Registry of Motor Vehicles listed 19 Orvis Road as Mousli's address. While Mousli's apartment did exist independently from the main residence at 19 Orvis Road, "[s]earch warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided." United States v. Syphers, 426 F.3d 461, 465 (1st Cir. 2005) (quoting United States v. Baldyga, 233 F.3d 674, 683 (1st Cir. 2000)). Just as in United States v. Gilman, 684 F.2d 616 (1st Cir. 1982), "[t]he testimony and affidavits of the officers demonstrate no misconduct on their part. Their surveillance of the premises . . . did not alert them to the multiunit character of the

building. The officers were not aware that the building contained separate living quarters or that it housed unrelated persons." <u>Id.</u> at 618. We find that the police had a valid search warrant, supported by reasonable information, and that the valid search warrant gave the police the authority to search Mousli's apartment. We conclude that the district court did not err when it denied Mousli's motion to suppress.

### 3. **Seizure of the Firearms**

In executing a search warrant, the police may only seize items that are either described in the warrant or are of an apparent seizable nature. <u>See</u> <u>Texas</u> v. <u>Brown</u>, 460 U.S. 730, 741 (1983). Mousli claims that the district court should have suppressed evidence of the firearms seized by the police during their search of his basement apartment because the firearms were not listed as one of the items to be seized in the search of his basement apartment. We also find this argument unconvincing.

It is unclear where the firearms were located in the apartment and whether or not they were in plain view. <u>See</u> <u>United States</u> v. <u>Antrim</u>, 389 F.3d 276, 283 (1st Cir. 2004) (describing requirements for a lawful plain view seizure). Mousli, however, does not argue that the Government exceeded the scope of the warrant because the items were not in plain view. Therefore, a plain view analysis is unnecessary. <u>See</u> <u>United States</u> v. <u>Díaz</u>, 494 F.3d 221, 226 (1st Cir. 2007). It is necessary, however, to

-10-

examine whether or not the police had the authority to take the firearms from Mousli's home. Contrary to Mousli's argument, the seizable nature of the firearms was apparent.

The police officers seized the firearms because they knew from Mousli's record, which they reviewed prior to executing the valid search warrant, that he was an alien with a prior conviction for larceny. Massachusetts law prohibits aliens and those convicted of certain crimes from obtaining a valid Massachusetts Firearms Identification card. See Mass. Gen. Laws ch. 140, § 129B(1)(i, vii). Based on Mousli's record, the police reasonably believed he was not licensed to have the firearms that were in his apartment. Since the police officers were lawfully in Mousli's apartment with a valid search warrant, the firearms in question were validly seized because the police had "probable cause to associate the property with criminal activity." Brown, 460 U.S. at 741-42 (quotation marks and italics omitted). Mousli makes no attempt to challenge the officers' contention that they believed he did not have the right to possess the firearms. The district court correctly admitted the firearms.

### B. Sufficiency of Evidence

Second, Mousli challenges the sufficiency of the evidence against him on the counterfeit charge. We review Mousli's claim of insufficient evidence de novo, considering whether the evidence, "viewed in the light most favorable to the prosecution, would allow

a rational jury to find all the elements of the crime beyond a reasonable doubt." United States v. Cotto, 456 F.3d 25, 27 (1st Cir. 2006).

In order for the jury to convict Mousli under 18 U.S.C. § 472, the Government had to prove (1) that the bill passed or possessed was counterfeit, (2) that Mousli intended to use the false bill to defraud, and (3) that he passed or possessed the false bill. See 18 U.S.C. § 472; see also United States v. Gomes, 969 F.2d 1290, 1293 (1st Cir. 1992) (recounting the legal standard for counterfeit). According to Mousli, the Government failed to provide sufficient evidence to prove either that the bills found in his apartment constituted counterfeit currency or that he possessed the bills with an intent to defraud. We disagree. A document is counterfeit if it is "calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest." United States v. Chodor, 479 F.2d 661, 664 (1st Cir. 1973) (internal quotation marks omitted); see also Gomes, 969 F.2d at 1293.

Mousli claims that there must be "a similitude, without which there is no counterfeit." See Gomes, 969 F.2d at 1293 (quoting United States v. Smith, 318 F.2d 94, 95 (4th Cir. 1963)); Smith, 318 F.2d at 95 (dismissing claim against defendant who possessed phony Federal Reserve notes that were "too crude to mislead"). Mousli argues that his alleged counterfeit documents,

while photocopies of U.S. currency, were unfinished and made of poor quality paper and ink.

A counterfeit document "does not have to be an artistic triumph or so good an imitation as to baffle an expert," or even be "entirely complete." Gomes, 969 F.2d at 1293. Although Mousli relies on Gomes and Smith, he fails to understand the distinctions between his own case and those cases. In Gomes, we found that allegedly fraudulent social security cards that were missing social security numbers, names, and signatures could not have been accepted as real. We held that the "most salient elements of a social security card" were missing. Id. at 1294. In Smith, the alleged counterfeit documents were slips of paper the size of a $10 bill with a faint, reversed facsimile of a bill on the front and nothing at all on the back. 318 F.2d at 95. Mousli's bills were far closer to the real thing, and only one bill did not have two sides complete. The bills had many defects, but none so serious as to prevent a reasonable jury from finding that the bills meet the statutory meaning of counterfeit. See Gomes, 969 F.2d at 1292-93; Chodor, 479 F.2d at 664 (proper test for determining what constitutes a counterfeit obligation is "whether the fraudulent obligation bears such a likeness or resemblance to any of the genuine obligations or securities . . . [and] is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright

and honest" (quoting United States v. Lustig, 159 F.2d 798, 802 (3d Cir. 1947), rev'd on other grounds, 338 U.S. 74 (1949)).

According to the evidence presented at trial, the quality of the alleged counterfeit bills was poor, but the bills could have passed as valid U.S. currency.  In fact, in several cases, bills of poorer quality than those at issue here have passed as valid bills. See Chodor, 479 F.2d at 663-64 (bills found to be counterfeit even though missing two serial numbers and a seal); United States v. Wethington, 141 F.3d 284, 286-87 (6th Cir. 1998) (counterfeit bills were smooth and cut crooked); United States v. Johnson, 434 F.2d 827, 829 (9th Cir. 1970) (photocopied reproductions pasted together were "not good counterfeit[]" but sufficient to support conviction under 18 U.S.C. § 472).  The jury had enough evidence to conclude that the bills met this low standard.

Mousli reprises this attack on his own handiwork in order to challenge another element of the crime: intent to defraud.  The bills, Mousli argues, are such bad copies that he could not have intended to defraud anyone with them.  But Mousli's contention misunderstands the law and ignores the other evidence available to the jury.

Mousli argues that where the evidence proves only possession of the counterfeit currency, "the jury must make an inference to find the requisite intent to defraud:  the closer the note resembles genuine currency, the more likely the defendant

intended to use it fraudulently to receive goods or services." Wethington, 141 F.3d at 287 n.2. Because Mousli is not accused of having passed or having attempted to pass these bills, he argues, the only way for the Government to prove his intent to defraud would be to demonstrate a high degree of similitude of the documents. We find Mousli's contention unconvincing.

When a defendant is charged with passing or attempting to pass counterfeit, evidence of that act may easily be probative of the intent to defraud. But mere possession of a counterfeit bill of very poor quality might not give rise to such an inference where the charge is for mere possession, as in this case, and poor quality suggests that it would be unlikely to be accepted in a transaction. See United States v. Hall, 801 F.2d 356, 358 (8th Cir. 1984) ("In a possession offense the intent to defraud is difficult to prove when the quality of the counterfeit is poor."). Mousli claims that his phony bills are inadequately convincing to prove intent to defraud, even if they are considered counterfeit.

Other courts have inferred intent to defraud in the counterfeiting context by examining "surrounding circumstances" in cases mostly dealing with the "passing" of counterfeit bills from one person to another. Pérez, 698 F.2d at 1171 (finding the most important "surrounding circumstance" to be the fact that defendant segregated his counterfeit bills from the genuine bills in his pocket); United States v. Rice, 652 F.2d 521 (5th Cir. 1981)

(relying upon use of enlarged counterfeit bill to make a small purchase, rather than smaller genuine bills in defendant's possession as a circumstance from which guilty knowledge could be inferred). These cases, however, reflect a concern with convicting an innocent bystander "passed" counterfeit bills without knowledge of their lack of authenticity. A rational jury could, on this evidence, have found beyond a reasonable doubt that he had the intent to defraud.

The requisite fraudulent intent required by the statute, 18 U.S.C. § 472, may be inferred from surrounding circumstances or circumstantial evidence and thus need not be proven directly. See United States v. Tucker, 820 F.2d 234 (7th Cir. 1987) ("The requisite fraudulent intent may be inferred from the surrounding circumstances."); United States v. Sink, 586 F.2d 1041 (5th Cir. 1978) (holding that surrounding circumstances often supply inferences of knowledge which adequately prove intent); United States v. Carlson, 359 F.2d 592 (3d Cir. 1966) (holding that the question of guilty knowledge and especially intent to defraud may be shown by other than direct evidence); United States v. King, 326 F.2d 415 (6th Cir. 1964) (holding that direct proof of intent to defraud is unnecessary, and that it may be inferred from the act of the parties and from all circumstances). Courts may look to surrounding circumstances to supply inferences of knowledge which adequately prove intent. See Pérez, 698 F.2d at 1171-72; Rice, 652

F.2d at 526; United States v. Grady, 665 F.2d 831, 835 (8th Cir. 1981); Slone, 601 F.2d at 803-04.  The facts here lead to an inference of Mousli's intent to defraud.

The absence of one kind of evidence, a high degree of likeness, does not prevent proof by other means of intent to defraud.  In this case, Mousli simply ignores the other evidence of intent to defraud available to the jury.  Here, the jury could infer that Mousli produced the bills because they were found in the vicinity of his printer and one of the bills was incomplete.  The number and variety of bills also suggest that Mousli was engaged in an ongoing effort to produce and refine fake currency with the intent of using it.  All of these facts taken together were sufficient for a reasonable jury to infer that Mousli had the intent to defraud.  Therefore, the district court did not err when it denied Mousli's motion for a judgment of acquittal.

### III.  Conclusion

For the reasons explained above, we affirm the judgment of the district court denying the motion to suppress, and we affirm that the jury's verdict was based on sufficient evidence to convict Mousli.

**Affirmed**.

Case 1:05-cr-10033-JLT    Document 56    Filed 12/14/2007    Page 18 of 18